# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-50155

United States Court of Appeals
Fifth Circuit

**FILED**

June 1, 2016

Lyle W. Cayce
Clerk

ANTONIO FRANCIS BUEHLER,

Plaintiff - Appellant

v.

CITY OF AUSTIN/AUSTIN POLICE DEPARTMENT; OFFICER PATRICK
OBORSKI; OFFICER ROBERT SNIDER; OFFICER JUSTIN BERRY;
SERGEANT ADAM JOHNSON,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, SMITH, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Officers of the Austin Police Department thrice arrested Antonio Buehler for interfering with police duties while he filmed APD interactions with other citizens. State magistrates and a grand jury found probable cause for each arrest, though the grand jury did not indict Buehler on more serious charges cited when he was arrested. Buehler sued the officers and the City of Austin for violating his constitutional rights. The district court granted summary judgment for the defendants, reasoning that under this court's "independent intermediary doctrine," the officers could not be held liable for arrests the grand jury found supported by probable cause. Because the independent

intermediary doctrine is established circuit law and Buehler presented insufficient evidence to support a finding that defendants "tainted" the grand jury proceedings, we affirm.

## I.

We first recount the underlying facts, beginning with Buehler's three arrests.

### A.

On January 1, 2012, Buehler was driving his friend Ben Muñoz home from New Year's Eve parties. When the pair stopped for gas, they noticed a DWI stop in progress. They watched Officer Patrick Oborski conduct a sobriety test and, at some point, saw him and Officer Robert Snider yank a passenger out of the suspect's vehicle and, in Buehler's opinion, mistreat her.[1] Buehler and Muñoz began photographing the encounter on cell phones, which the passenger encouraged. As Buehler attempted to take pictures from about twenty feet away, he cursed at the officers and asked them why they were mistreating the passenger.

After the passenger was handcuffed, Oborski moved toward Buehler. It is undisputed that Oborski then touched Buehler: on Buehler's account, the officer shoved, pushed, and poked him while Buehler gestured that he was not a threat; on Oborski's account, he merely placed his hand on Buehler's shoulder to maintain a safe distance because Buehler was "out of control." Oborski repeatedly accused Buehler of interfering with his investigation, which Buehler denied while criticizing Oborski. Eventually, Oborski took out handcuffs, ordered Buehler to put his hands behind his back, and (along with Snider) attempted to physically subdue him. Buehler initially resisted to some

---

[1] Snider claims that he acted to stop the passenger from texting and talking on her cell phone, which officers are trained to prevent because dangerous individuals could be summoned to the location of the traffic stop.

degree but submitted after Snider threatened to taze him. Oborski maintains that he arrested Buehler only after Buehler spit in his face, which Buehler denies. Buehler was cited with felony harassment of a public servant and misdemeanor resisting arrest.

That same day, a state magistrate reviewed an affidavit filed by Oborski, who swore that Buehler was "verbally aggressive," spit in his face, and violently resisted arrest. The magistrate determined that probable cause existed for the issuance of an arrest warrant.

After this arrest, Buehler and other activists launched the Peaceful Streets Project, a "grassroots initiative to translate . . . support [of Buehler] into a more engaged citizenry focused on holding police accountable and into broader support for victims of police abuse." PSP trains people on their rights when interacting with police, teaches them how to record police interactions, and shares stories of alleged APD abuses. The group also organizes "cop watch" events intended to deter police misconduct, document evidence for victims of police misconduct, and allow victims to "regain some agency over their lives." According to Buehler, APD officers have attempted to hinder cop watches by making it difficult or impossible for PSP members to effectively record police-citizen interactions. Buehler also avers that APD officers have assaulted and arrested PSP members without justification, though he admits that group members sometimes ignore what Buehler terms "illegal or arbitrary orders." The defendants maintain that Buehler and other PSP members frequently yell obscenities at APD officers, draw resources away from investigations, and have harassed officers by, for example, posting the address and pictures of Oborski's home on the internet.

B.

In the early hours of August 26, 2012, Buehler and other PSP members began filming Officer John Evers interacting with Christopher Williams—who

was being arrested—and his fiancée, Courtney Sadler. Williams became agitated at Buehler's filming and eventually said that he wanted to press harassment charges. The parties dispute whether Sadler was also angry at Buehler. As Evers walked Williams to a detention center, Officer Justin Berry told Buehler to step back and accused him of interfering. Berry repeated his order to back up, but Buehler protested that he had done nothing wrong. After giving Buehler another warning, Berry arrested him for interfering with public duties.

That same day, Berry swore in an affidavit that Buehler's filming and refusals to back up agitated Williams and Sadler to the point that it created a safety hazard. A state magistrate found probable cause for the issuance of an arrest warrant.

C.

During another cop watch on September 21, 2012, Buehler positioned himself about twenty-five feet from Oborski's squad car to film a DWI stop. Oborski repeatedly ordered Buehler to back up until he told him to stop. But Sergeant Adam Johnson subsequently told Buehler and another PSP member to move toward and past Oborski to join two other filmers. Buehler began to back up and asked Johnson why he couldn't film from farther back in the same area, claiming that he wouldn't be able to see from the spot to which Johnson was ordering him. Johnson responded that he had given an order, and that Buehler would be arrested if he refused to obey. Buehler protested that Johnson hadn't "give[n] [him] like a really good reason before [he] start[ed] barking orders." Buehler continued to back up—to, he claims, at least eighty feet from the DWI stop—and asked Johnson why he could not stay put. Johnson reiterated his order, telling Buehler that he could either stand where had been told to or leave the scene altogether. Buehler said that he was leaving, but asked Johnson several times why he was "bossing [them] around"

4

and being a "bully," at which point Johnson said, "OK, you're going to jail," and arrested Buehler.

An Officer Holmes—not a defendant in this action—swore an affidavit stating that Johnson gave a minimum of three orders and told Buehler that he could continue to film if he moved to where Johnson had directed. According to Holmes, Buehler was standing on the sidewalk where Oborski intended to conduct a field sobriety test, and Buehler's refusals to move interfered with the investigation by forcing Holmes and Johnson to focus on him, leaving Oborski without backup. A magistrate reviewed the affidavit and found probable cause for the arrest.

### D.

A single grand jury considered the charges relating to all three arrests. For each incident, the grand jury indicted Buehler for the misdemeanor of failing to obey a lawful order: Oborski's order for Buehler to put his hands behind his back on January 1, Berry's order to back up on August 26, and Johnson's order to move to a specified location on September 21. A person commits the offense of failing to obey a lawful order if he "knowingly fails or refuses to comply with an order or direction of a peace officer that is given by a visible or audible signal." Austin Mun. Ord. § 9-4-51. The grand jury did not indict Buehler on the more serious charges cited each time he was arrested. In October 2014, a jury found Buehler not guilty of failing to comply with a lawful order during the January incident. Buehler has not been tried on the other charges.

In December 2013, Buehler filed this lawsuit against the City, Officers Oborski, Snider, Berry, and Johnson, and Police Chief Art Acevedo. In addition to state-law claims, Buehler alleged that the defendants (1) violated his Fourth and Fourteenth Amendment rights by detaining, searching, and prosecuting him without probable cause, (2) violated his First and Fourteenth Amendment

rights by interfering with his filming efforts, and (3) conspired to deprive him of his constitutional rights. Citing the independent intermediary doctrine, the district court granted summary judgment in favor of defendants on all of Buehler's federal claims.[2] *Buehler v. City of Austin*, No. A-13-CV-1100-ML, 2015 WL 737031 (W.D. Tex. Feb. 20, 2015). This appeal timely followed.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standard on appeal as that applied below." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could find for the nonmovant. *Rogers*, 755 F.3d at 350.

## III.

Buehler first asks that we "overrule" our cases applying the independent intermediary doctrine, which becomes relevant when—as here—a plaintiff's claims depend on a lack of probable cause to arrest him. *See Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010) (applying the independent intermediary doctrine to Fourth Amendment claims); *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013) (applying the doctrine to First Amendment claims).[3] Under this doctrine, "even an officer who acted with malice . . . will not be liable if *the facts* supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that

---

[2] Having dismissed all of Buehler's federal claims, the district court declined to exercise supplemental jurisdiction over his state-law claims. *See* 28 U.S.C. § 1367(c)(3).

[3] *See also Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (explaining that a First Amendment claim based on arrest fails if probable cause existed); *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ("The 'constitutional tort[]' of false arrest . . . require[s] a showing of no probable cause.").

intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party." *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988) (quoting *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir. 1982)). Our precedents have applied this rule even if the independent intermediary's action occurred after the arrest,[4] and even if the arrestee was never convicted of any crime.[5] As discussed below, however, the "chain of causation is broken only where all the facts are presented to the grand jury, or other independent intermediary where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Cuadra*, 626 F.3d at 813 (quoting *Hand*, 838 F.2d at 1428).

Though Buehler cites other circuits' decisions in varying degrees of tension with our independent intermediary doctrine,[6] this court has consistently applied the doctrine in published opinions. "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *Robinson v. J&K Admin. Mgmt. Servs.*, 817 F.3d 193, 197 (5th Cir. 2016) (quoting *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). Because

---

[4] *See Taylor v. Gregg*, 36 F.3d 453, 455, 456–57 (5th Cir. 1994) (applying doctrine where presentment to magistrate and grand jury occurred after arrest), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003) (en banc).

[5] *See Russell*, 546 F. App'x at 434, 436–37; *see also Smith*, 670 F.2d at 526 ("The constitution does not guarantee that only the guilty will be arrested.").

[6] *See Jones v. Cannon*, 174 F.3d 1271, 1287 (11th Cir. 1999) (holding that a grand jury indictment insulated police officers from damages accruing after, but not before, the indictment); *Arnott v. Mataya*, 995 F.2d 121, 124 n.4 (8th Cir. 1993) (rejecting the argument that a grand jury indictment insulated police officers from false arrest claims); *cf. McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (holding under New York law that a grand jury indictment does not create a presumption of probable cause for false arrest claims). *But see Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (articulating principles similar to this court's intermediate intermediary doctrine and citing two Fifth Circuit cases with approval).

No. 15-50155

Buehler cites no such intervening change, we are governed by our existing independent intermediary doctrine.

## IV.

Buehler also argues that the district court erred in granting summary judgment despite evidence creating a genuine dispute of material fact regarding the independent intermediary doctrine's "taint" exception. Under this exception, an independent intermediary's probable cause finding does not protect law enforcement officials whose "malicious motive . . . lead[s] them to withhold any relevant information," *Cuadra*, 626 F.3d at 813, or otherwise "misdirect[] the magistrate or the grand jury by omission or commission," *Hand*, 838 F.2d at 1428.

"[M]ere allegations of 'taint,' without more, are insufficient to overcome summary judgment." *Cuadra*, 626 F.3d at 813. Rather, the plaintiff must "affirmatively show[]" that the defendants tainted the intermediary's decision. *Craig v. Dall. Area Rapid Transit Auth.*, 504 F. App'x 328, 332 (5th Cir. 2012); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004). To satisfy the taint exception, omissions of exculpatory information must be "knowing[]." *Cuadra*, 626 F.3d at 813–14; *see Allen v. Jackson County*, 623 F. App'x 161, 162 (5th Cir. 2015). And because the intermediary's deliberations protect even officers with malicious intent, *Hand*, 838 F.2d at 1427, that an officer "harbored ill-will toward" the defendant does not suffice, *Craig*, 504 F. App'x at 333.

Here, the district court concluded that Buehler failed to show a triable issue whether the grand jury's findings of probable cause were tainted by false or misleading statements by the arresting officers. *Buehler*, 2015 WL 737031,

8

No. 15-50155

at *12–13. Having reviewed Buehler's brief and cited evidence, we find no error in that conclusion.[7]

Primarily, Buehler attempts to show taint by pointing to alleged inconsistencies between (1) videos of the arrest incidents, his own affidavit, and other witnesses' accounts; and (2) the officers' reports, arrest affidavits, and deposition testimony—which he connects to the grand jury proceedings by citing statements that the officers testified to the same matters before the grand jury. Buehler cites no direct evidence of what was actually presented to the grand jury, though the record does suggest that Snider and Oborski testified similarly to the grand jury as they did in their depositions on some matters. Even assuming that the evidence Buehler points to mirrors grand jury testimony, it does not show that the grand jury's findings of probable cause that Buehler failed to obey lawful orders were tainted by the officers' knowing

---

[7] Buehler often eschews precise record citations in his appellate brief, instead citing entire exhibits—including a five-hundred-page trial transcript and lengthy videos—for important factual propositions. This violates our rule that "[e]very assertion in the briefs regarding matter in the record must be supported by a reference to the page number of the original record," 5th Cir. R. 28.2.2, and fails to satisfy Buehler's burden "to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence supported [his] claim," *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994); *see also Williams v. Merck & Co., Inc.*, 381 F. App'x 438, 444 (5th Cir. 2010) ("Citations on the order of '*See Pelkowski entire Deposition*' and '*See deposition of Williams*' are not what we, as a court bound to apply the law to the facts, are looking for. Page numbers are important . . . ."). "It is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). We nonetheless have done our best to review the evidence identified in the argument section of Buehler's brief. But we have not gone to extraordinary lengths to review those cited video exhibits that Buehler failed to send to this court with the record on appeal, did not move to add to the record until after oral argument, *and* provided to the district court in file formats we have been unable to view. Nor have we reviewed evidence that Buehler chose not to cite in the argument section of his brief, but listed with scant explanation in a postargument letter. *See Forsyth*, 19 F.3d at 1537; *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." (quotation marks omitted)).

misstatements or omissions.[8]  Much of Buehler's evidence simply shows that his actions and those of the arresting officers were subject to different interpretations.  *See Anderson v. City of McComb*, 539 F. App'x 385, 387 (5th Cir. 2013) (affirming court's ruling that the independent intermediary doctrine shielded a police chief where he presented one version of legitimately disputed facts to a magistrate judge).  Other alleged inconsistencies are not material to the grand jury's findings of probable cause, or do not stem from knowing falsehoods or omissions attributable to the defendants.  *Cf. Kugle v. Shields*, No. 93-5567, 1995 WL 450219, at \*4 (5th Cir. July 7, 1995) ("[O]fficers who maliciously or reckless[ly] misrepresent or omit material information in presenting such information are not shielded from liability.").

Such evidence is especially unpersuasive here because the grand jury heard testimony from Buehler and several witnesses who testified in Buehler's favor at his criminal trial—and presumably would have been favorable to Buehler before the grand jury as well—but still returned indictments.  We have rejected taint arguments even where the grand jury did not hear from pro-plaintiff witnesses and the plaintiff "dispute[d] the version of the facts presented as well as the prosecutor's failure to present potentially exculpatory evidence," explaining "that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal

---

[8] "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."  *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir. 1998).  There need only be probable cause to support the arrest, not "each individual charge made during the course of the arrest."  *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001).  So to the extent Buehler argues that there was not probable cause that he committed the more serious crimes the grand jury no-billed (*e.g.*, his argument that video of the January 1 incident shows that he did not spit on Oborski as would support a felony harassment charge), that fails to show that the grand jury's findings of probable cause for failure to obey lawful orders were tainted.  *See Russell*, 546 F. App'x at 437.

charge." *Russell*, 546 F. App'x at 437 (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)).

Buehler also relies on an expert report opining that the arresting officers did not have probable cause to arrest Buehler in any of the three incidents, and that the APD targeted Buehler for arrest and prosecution. But this expert's disagreement with the grand jury's probable cause findings does not show the grand jury proceedings were tainted.[9] Nor does evidence arguably showing that APD officers may have borne ill will toward Buehler create a triable issue. *See Hand*, 838 F.2d at 1427 (explaining that the independent intermediary doctrine insulates even officers who act with malice); *Smith*, 670 F.2d at 526. In sum, the district court did not err in finding no genuine dispute of material fact whether the defendant officers tainted the grand jury's deliberations.[10]

## V.

Under established circuit law, Buehler had the burden of affirmatively showing that the grand jury's deliberations were tainted, and failed to do so. The judgment is AFFIRMED.

---

[9] For similar reasons, the testimony of a law enforcement expert called by the City during Buehler's criminal trial, who said that citizens generally have the right to question and film officers and should not be assaulted for doing so, does not show any taint in the grand jury proceedings.

[10] In light of this holding, we, like the district court, need not consider the parties' arguments about the magistrates' findings of probable cause. Also, because we affirm dismissal of Buehler's federal claims and the district court did not abuse its discretion in declining supplemental jurisdiction over Buehler's state-law claims, *see Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993), we do not address Buehler's claims under Texas law.